IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GLENNEISHA JONES, as Guardian and Conservator for COREY BROADEN, and GLENNEISHA JONES, individually, as the Spouse of COREY BROADEN,<br><br>Plaintiffs,<br><br>v.<br><br>GMAX, LLC, and BRIANA J. BLACKMON,<br><br>Defendants. | CIVIL ACTION FILE<br><br>NO. 15-cv-00083-AT |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS PRESENTING A GENUINE ISSUE FOR TRIAL

Plaintiffs submit this Statement of Disputed Material Facts, pursuant to Local Rule 56.1(B)(2)(b). They show that numerous material facts are disputed and present genuine issues for trial, making summary judgment inappropriate.

**The Incident**

1. Corey Broaden's GMAX model GM68S helmet was defectively designed. See Report of Kenneth Saczalski, Ph.D, attached as **Exhibit A**.

2. While wearing his GMAX helmet, Mr. Broaden was involved in a traffic collision in which he suffered catastrophic physical injuries. Report of Wayne

McCracken, attached as **Exhibit B**, p. 2; Report of Paul Lewis, Jr., attached as **Exhibit C**, p. 1.

    3. Mr. Broaden's injuries were a proximate result of the product defects. Report of Kenneth Saczalski, Ph.D., pp. 4-7; Report of Paul Lewis, Jr., pp. 23-28.

**GMAX's Relevant History and Structure**

    4. The origin of GMAX (and ultimately the 68S helmet) dates back to 1999, when a Canadian, Jack Ramsay, came up with the idea to make motorcycle helmets for the North American market. Dep. of Roger Marshall as Corporate Representative of GMAX ("GMAX Dep."), relevant portions attached as **Exhibit D**, pp. 16-17.

    5. Ramsay knew of a company in Taiwan, An Yng, that could make helmets if he formed a company. Id. 25-31 ("they had agreed to produce helmets for [Ramsay], if he formed a company to – to do so").

    6. Ramsay talked with his friend from years in the industry, Roger Marshall, about the concept. Id. 16-17.

    7. Together, they ran with the idea and created GMAX, LLC – a motorcycle helmet company comprised of six equity partners or "members," each with a 1/6 interest: Marshall Distributing (Roger Marshall's distribution company), McMurter Racing (the company of GMAX's first employee, Reuben McMurter), Gamma

Sales, Inc. (distribution company owned by Jack Ramsay's brother), Shoemaker, Inc. (alter ego of Western Power Sports, Inc. – a third distributor, selected by Mr. Marshal for participation and eventually official member), Sandra Ramsay (Jack Ramsay's sister-in-law), and Yang Shang "Aaron" Hsuan (owner of An Yng). GMAX Operating Agreement, attached as **Exhibit E**; GMAX Dep., pp. 16-17, 26-27.

8. GMAX also employed a "product manager" who actively communicated with An Yng, distributors and customers about the GMAX products they were designing, making and selling. McGathy Emails to Customers, attached as **Exhibit F**; Emails Sent to An Yng from GMAX Regarding Products ("Product Emails"), attached as **Exhibit G**.

9. GMAX directly profits from its role as the designer and coordinator of An Yng and its distributors by receiving 12% of each GMAX helmet sale. Dep. of Robert Marshall as Corporate Representative of Marshall Distributing, attached as **Exhibit H**, p. 16.

**The Creation of the GMAX 68S Helmet**

10. GMAX held a meeting in Taiwan in October of 2006, in which the GMAX "68S" model was first conceived. October 2006 GMAX Product Meeting Notes ("Oct. 06 Mtg. Notes"), attached as **Exhibit I**, ¶ 63.

11. That meeting in Taiwan was attended by multiple GMAX partners and employees, including Jack Ramsay, Craig Shoemaker, Roger Marshall, Po-Chou Yang, Mike Shean, and Rueben McMurter. These individuals were personally present and provided input about the 68S (and numerous other helmets discussed in the minutes). GMAX Dep., p. 48.

12. In paragraph 63 of that meeting's minutes, typed in bold all capital letters (which Marshall indicated to generally be statements by GMAX employee Reuben McMurter), it states:

> 68S: NEW FULL FACE DOT HELMET TO BE DEVELOPED. DESIGN WORK TO BE DONE A.S.A.P. MOCK-UP SHELL BACK TO NORTH AMERICA FOR DESIGN WORK. PRODUCTION TARGET MAY 2007, WEIGHT 1400 GRAMS, PRICE TARGET 720-800 NT, RETAIL U.S. 89.95, CANADA 119.95, LOTS AND LOTS OF VENTING, IMPROVED SHIELD RATCHET WITH 1ST STOP SMALLER OPENING, INTERIOR MATERIAL? NOTE KEEP BREATH GUARD SNAPS AWAY FORM CENTRE AS MUCH AS POSSIBLE.

13. Following that initial October 2006 conception meeting, in May 2007 another meeting was held – this time in North America, where GMAX is located – with the meeting minutes titled "GMAX PRODUCT MEETING REVIEW." May 2007 GMAX Product Meeting Notes ("May 07 Mtg. Notes"), attached as **Exhibit J**.

14. The first topic discussed in that meeting was the 68S model, and as reflected by handwritten initials "RM" in the left margin, it was attended by GMAX representatives including Reuben McMurter. GMAX Dep. 76-77.

15. Roger Marshall, who was present at this meeting, confirmed that the 68S was a large topic of discussion. Id. at 83. Examples of GMAX involvement reflected in this document include:

- GMAX approving the design with the caveat that the interior needs more work, with An Yng assuring that they are working on GMAX's remaining concerns ("we are fixing this now") (May 07 Mtg. Notes ¶ 1)

- GMAX informing its members that their cheek pad and curtain style preferences had been incorporated (Id. at ¶ 2)

- GMAX deciding that higher quality screws needed to be used due to problems with rust (Id. at ¶ 4)

- GMAX deciding that a new instruction and warning booklet was required over An Yng objection (Id. at ¶ 8)

- An Yng modification of mold to fit GMAX vent design (Id. at ¶¶ 11-12)

**Other Evidence of GMAX's Active Role in the Design Process**

16. In an email exchange between Jack Ramsay and Darren Yang, Mr. Ramsay identifies a trend of errors An Yng has made, such as using incorrect helmet liners on certain models, but writes that the mistakes are *GMAX's fault for not effectively communicating how it wanted An Yng to construct its helmets.* February 2008 Emails Between Jack Ramsay and Darren Yang ("Future of GMAX Emails"), attached as **Exhibit K.**[1]

17. In the same email, Mr. Ramsay goes on to outline the entire production process, ***beginning with GMAX supplying design drawings and ideas for interior updates***, and ending with shipment, all of which is done *for the purpose of establishing a production timeline for An Yng*. Id.[2]

---

[1] ("these helmets should have used the 48S style comfort liner, but even the new samples came with the wrong comfort liners . . . I am not blaming Anyng in anyway, these are all 100% Gmax problems, we were not organized, we did not allow enough time for Anyng to create the products and we did not communicate with all the people involved with Gmax . . . Gmax should have presented Anyng with drawings etc of a new visor and mouth vent for the 46XY and even ideas for a updated interior.")

[2] ("Darren for any new product to come out a year from now, we have to finalize these products right now. Just start and work backwards, if a dist is to have a new product in their warehouse right now, lets do a timetable . . . on any current helmet model, Anyng needs 4-5 months to produce. On a new products to get up to speed in production, Anyng needs and extra month . . . if Anyng received drawings of a new visor / mouth vent today, it would take Anyng time to do a RP mock up, send to Gmax, get acceptance etc, if NO problems, this will take 60+ days just for RP. If any changes and there are always changes, add another 30 days. TOTAL time at

18. This timeline includes time *for GMAX* to review and make changes to products, and the email specifically directs An Yng to further develop ideas for a dual sport helmet that will be provided *by GMAX*. Id.

19. Darren Yang's response to Mr. Ramsey's email includes the statement, "**we don't want to see there are different directions from Gmax and we don't know which one we *must* follow**." Id. (emphasis added).

20. GMAX's corporate representative, Mr. Marshall, admitted that he could not think of a single instance where An Yng refused to act in accordance with GMAX's wishes. GMAX Dep., p. 100.

21. This is perhaps not surprising given that the helmets made by An Yng were apparently originally produced solely for GMAX's members to buy and sell, as An Yng was contractually prohibited from selling to any other North American entities. Id. at 68.

22. In fact, when An Yng wanted to expand to markets outside of North America, *it first asked GMAX's permission*, further underscoring the subservient role An Yng played in its relationship with GMAX. Id. at 65-69.

---

least 3 months. Now it will take 2-3 months for moulds etc., then well all this is going on Anyng and Gmax must finalize the graphics and interior changes, allow another 30-60 days . . . We need a schedule of priorities, timelines etc for the next 2-3 years, if we are going to get ahead of things.")

23. The evidence reveals that GMAX was intentional about making An Yng comply with its design choices. In another email written by Jack Ramsay in April 2007, he speaks collectively for the distributors who he represents (and who were equity members of GMAX, LLC) to demand specific changes to the very helmet model at issue in this case, the 68S. April 2007 Email from Jack Ramsay to Darren Yang ("68S Email"), attached as **Exhibit L**.[3]

24. Mr. Ramsay explicitly invoked GMAX's authority to accept or reject helmet designs for the purpose of coercing An Yng to make changes. Id.

25. It was not merely common place, but *standard operating procedure* for GMAX and/or its members to demand of An Yng very specific changes to any helmet which they did not entirely approve of. Examples include:

- Deciding whether to create new models and whether to discontinue existing models of helmet (September 2008 GMAX Meeting Agenda, attached as **Exhibit M**)

- Discussing design shapes and working on sketches and feature lists for new helmet model (Product Emails, pp. 9-11)

---

[3] ("I really don't like the top vent, I don't like the cheek pad design. I don't like the lack of a rear curtain. I don't like the front vents or the side vents . . . Just remember, Anyng is making the helmet, selling it to Gmax BUT the distributors are the ones who must accept it . . . If you ask Reuben right now, if the dist accept, I am afraid the answer is NO.").

- Discussing interest in new model but unsure so decides to hold off on production (Id.) (demonstrating control of production process)
- Discussing change material that shin bar is made out of (Id.)
- Reviewing computer-assisted design drawings and asking that the shells be made slimmer, withheld final approval pending review of mock-up March 2011 GMAX Meeting Notes ("March 11 Mtg. Notes"), attached as **Exhibit N**, p. 7.
- Telling An Yng to modify lateral interior styro to improve room and comfort because GMAX thought fit was too tight (Id. at 6)
- Reviewing mock-up of breath guard and asking for modifications (Id. at 5)
- Suggesting interplay between shell mold and styros and liners is the cause of sizing problem identified by GMAX (Id. at 4)
- Modifying vents and changing interior vent covers according to GMAX wishes (Id. at 4)
- Setting An Ying ordering and shipping policies and altering factory labor processes/organization (Id. at 3)
- An Yng is ordered by GMAX to redo an instruction manual and asks if it has to, to which GMAX responds "yes" (May 07 Mtg. Notes ¶ 8)
- Modifying venting on the mold (Id. at ¶ 11)

9

- Accepting the **68S model** with caveat that there is interior work that needs to be done (Id. at ¶ 1)

- Changing the quality of a screw used in one model (Id. at ¶ 4)

- Reviewing changes in materials and thickness (Oct. 06 Mtg. Notes ¶ 46)

- Discussing new helmet model planned designed features including narrow shell design, additional venting, and higher quality materials (Id. at ¶ 23)

- Discussing mold modification implemented to address molding fit problem (Id. at ¶ 40)

- Deciding to use modified rivets for attaching interior to shell, required An Yng to submit result for review to GMAX (Id. at ¶ 10).

26. The decisions GMAX made during product meetings or through product update communications were forwarded to An Yng for implementation. Product Emails; An Yng Response Email, attached as **Exhibit O** (reproduction of pp. 2-8 of **Ex. G** which includes An Yng responses indicating compliance); March 2008 Email from Reuben McMurter to Dave Luana and Dan Nowlan, attached as **Exhibit P** (stating factory would be "receptive" of any suggestions).

## GMAX's Representations to Customers and Other Communications from its Product Manager Further Confirm its "Active Role."

27. Beyond internal communications between GMAX and An Yng, representations from a GMAX employee to two different customers further evince that GMAX was far more than a distant "trademark owner" in regard to GMAX helmets as it now contends. Dkt. 156-1, pp. 3-4.

28. Specifically, in April and July of 2010, GMAX's then-product manager, Charles McGathy, sent emails to at least two customers, with the GMAX name and address and his company title in the signature line, containing the following message:

> There is [sic] a lot of things *we put into our helmets*. That being – fit, function, fashion, and first and foremost – safety. I find it extremely personally rewarding that *our safety efforts at GMAX* has [sic] provided you life saving protection through *our* award winning GM68 helmet.

(emphasis on multiple possessive pronouns supplied). McGathy Emails to Customers.

29. GMAX attempts to dismiss these emails[4] by characterizing them as the "bragging" "puffery" of "a salesman." Dkt. 156-1 at 10. This is an odd way to

---

[4] GMAX's brief refers to only one email, but there are two, both of which use the exact same quoted language, indicating carefully crafted message that the author stands by as opposed to some half-baked bit of "bragging."

11

refer to Mr. McGathy, however, since, at the time he wrote these emails, his title was that of "product manager" (not salesman), (See McGathy Emails to Customers.), and GMAX has repeatedly claimed as a "fact" that it does not directly sell the helmets. Dkt. 156-1, pp. 4, 8.

30. Mr. McGathy had firsthand knowledge of what went into the design of GMAX helmets since there are records of him working with Darren Yang on the design of a vent/light piece prior to sending either of the above-referenced emails. McGathy Email to GMAX Members, attached as **Exhibit Q**.

31. Furthermore, it was evidently his job to ensure that the "input" provided by GMAX was actually implemented, as demonstrated by the March 2011 meeting notes, which stated that he would "work closely with factory to manage through factory delays." GMAX Dep., pp. 121-22 and Exhibit 7, p. 8.

**Evidence of GMAX's Role with Recalls and Testing**

32. There is evidence of GMAX handling recalls of one of its helmets. NHTSA report. NHTSA Safety Defect/Noncompliance Notices of January 2016, attached as **Exhibit R**.

33. There is evidence GMAX was involved in carrying out product testing and replacing broken helmets. Safety Compliance for FMVSS No. 218 Laboratory Test Report, attached as **Exhibit S**; GMAX Dep., p. 90.

Respectfully submitted, this 23rd day of May, 2018.

                                CONLEY GRIGGS PARTIN LLP

                                /s/ *Cale Conley*
                                CALE CONLEY
                                Georgia Bar No. 181080

                                4200 Northside Parkway, N.W.
                                Building One, Suite 300
                                Atlanta, Georgia 30327
                                Phone: 404-467-1155
                                Fax: 404-467-1166
                                cale@conleygriggs.com
                                learnest@conleygriggs.com

                                **ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF PROPER FORMAT**

This is to certify that the foregoing was prepared in Times New Roman, 14-point font, in accordance with Local Rules 5.1 and 7.1(D).

This 23rd day of May, 2018.

**CONLEY GRIGGS PARTIN LLP**

/s/ *Cale Conley*
CALE CONLEY
Georgia Bar No. 181080

# CERTIFICATE OF SERVICE

This is to certify that I have this date filed and served the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT GMAX'S MOTION FOR SUMMARY JUDGMENT** through the Court's CM/ECF filing system which will automatically serve a copy of said pleading upon all counsel of record.

This 23rd day of May, 2018.

**CONLEY GRIGGS PARTIN LLP**

/s/ *Cale Conley*
CALE CONLEY
Georgia Bar No. 181080
