# EXHIBIT D

1    ROGER MARSHALL

2         IN THE UNITED STATES DISTRICT COURT

3         FOR THE NORTHERN DISTRICT OF GEORGIA

4              ATLANTA DIVISION

5    GLENNEISHA JONES as Guardian

6    and Conservator for COREY

7    BROADEN, and GLENNEISHA JONES,

8    individually, as the Spouse of

9    COREY BROADEN,

10              Plaintiffs,

11       vs.                    Case No. 15-cv-00083-WBH

12   GMAX, LLC., 4162 DOERR ROAD,

13   INC., d/b/a MARSHALL

14   DISTRIBUTING, INC., AN YNG

15   ENTERPRISE CO., LTD., and

16   BRIANA J. BLACKMON,

17              Defendant.

18   _____

19       The 30(b)(6) Videotaped Deposition of ROGER MARSHALL

20       as Corporate Representative of GMAX, LLC,

21       Taken at the offices of Miller Canfield, 840 West Long

22       Lake Road, Suite 150, Troy, Michigan, Wednesday, June 24,

23       2015.

24       Job No. 94729

25       Before Kathy Adkins, CSR-4697, CRR, RMR, RPR, B.A.

ROGER MARSHALL

2 understood, in regard to the design, manufacturing,

3 branding, licensing, acquisition, marketing,

4 distribution or sale of GMAX-branded motorcycle

5 helmets.

6 So let me ask, with that topic being

7 covered, in regard to the sale of GMAX helmets, what

8 are the relative roles or responsibilities of GMAX

9 versus Marshall Distributing in your own words?

10 A. In the transactions and purchasing the helmets you

11 mean?

12 Q. Yeah. I'm just trying to figure out -- let me try it

13 again.

14 A. Okay.

15 Q. Why have the two companies?

16 A. Well, GMAX was formed by -- started by our partner in

17 London, Ontario, named Jack Ramsay, and he was

18 involved in promoting and helping Shoei Helmet Company

19 of Japan get a start in North America, and he was the

20 largest distributor of Shoei helmets in the world, I

21 guess, and then he helped another competing company,

22 HGC of Korea get started in North America and he also

23 distributed their helmets.

24 And then he called me one day and wanted to

25 know if I would like to go in with him in a new

ROGER MARSHALL

1

2       company that had no name at that time and start

3       another helmet company and I said sure.

4                   And his brother at the time owned the other

5       partnership, and the other partner of GMAX in Aurelia,

6       Ontario, named Gamma Sales, so he had his brother

7       already agreed to go in and he wanted another

8       distributor in the U.S., along with us, so I chose

9       Western Power Sports of Boise, Idaho, to be the third

10      distributor.

11                  And does that answer your question?

12      Q.   Yeah.  Let me ask a follow-up.

13                  You said that Mr. Ramsay called and asked

14      to go in on a new company and you said sure, was that

15      new company GMAX?

16      A.   Yes.

17      Q.   Okay.  And based on the documents that I've seen,

18      including Exhibit 3, the GMAX, LLC, was formed in

19      March of 1999?

20      A.   Yes.

21      Q.   And you were involved from the onset of the formation?

22      A.   Yes.

23      Q.   And was your title, has your title been managing

24      member throughout that period since 1999?

25      A.   Yes.

ROGER MARSHALL

1
2    as a Marshall person with GMAX and the factory.

3 Q.  And you said "our" product manager, buyer.

4 A.  Marshall Distributing's product manager.  Sorry.

5 Q.  That's okay.  I just -- that's what I wanted to, I'm

6    trying to draw these lines so that it's clear going

7    forward who is sort of with who, and I think I'm

8    getting into one of the other topics about names of

9    people involved, but what we cover now we won't have

10    to cover later and I think it's topic seven I believe.

11          David Luana, anyone else that's employed by

12    Marshall Distributing that would have had, you know,

13    substantive interaction with the manufacturing

14    facility?

15 A.  No.

16 Q.  All right.  And this may bleed us into topic number

17    two, which for the record is the relationship between

18    GMAX, LLC, and An Yng Enterprise Co., Ltd., am I

19    pronouncing that right?

20 A.  Yes.

21 Q.  And within topic two there are a number of -- of

22    questions, and I'll go ahead and start turning to

23    them.

24          When did the relationship between GMAX and

25    An Yng Enterprise Co., Ltd., who I'll call An Yng for

ROGER MARSHALL

2          the rest of the day if that's okay, when did it begin?

3    A.    Immediately when we started the company, and actually

4          Mr. Ramsay had already contacted An Yng before he

5          called me.  He already had his plan in order.  He had

6          already visited the factory and they had agreed to

7          produce helmets for him, if he formed a company to --

8          to do so.

9    Q.    And was Mr. Ramsay an initial member of GMAX, LLC?

10   A.    Yeah, you'll find him as a member under CJCO, Inc.,

11         that's his Delaware corporation for tax purposes to

12         have a tax, I mean to have tax liability in the U.S.

13   Q.    Okay.  And I also see, looking back to Exhibit 3, that

14         there's a Peter Ramsay and a Sandra Ramsay who were --

15   A.    That was initially Mr. Ramsey's brother and

16         sister-in-law.  They sold the business to their

17         stepson, Mike Shean and Mike Shean then changed it to

18         MSG, Inc.

19   Q.    And yeah, as I continue to look through Exhibit 3,

20         you're correct, I was looking at that first signature

21         page.  If we look as of, it says as of September 26,

22         2004, transfers, it identifies Ramsay Corp. from

23         London, Ontario, Canada, is that Mr. Ramsay?

24   A.    Yes.

25   Q.    But putting aside the document for a moment,

ROGER MARSHALL

Mr. Ramsay made the first contact with An Yng and when he came to you to discuss forming what became GMAX, LLC, he had already conceived the idea of using that facility to make helmets and then GMAX, or the company that became GMAX, would sell them here in the U.S. or North America?

A. Yes.

Q. Okay. So and that was one of my questions is, and I want to be clear, that it was a member of GMAX, LLC, that first contacted An Yng about making helmets.

A. Well, when he first contacted An Yng, he would be a future member.

Q. He was -- I'm trying to harken back to my law school days, there's a legal term for that when you're about to start a company, but we can -- Mr. Ramsay, who along with you, was one of the founding members of GMAX, LLC. He's the one who conceived the idea to talk to An Yng about making the helmets and the idea was from that point they would be made there and sold by GMAX here in the United States.

A. Yes.

Q. It was not a situation in which someone from An Yng called over here to you or Mr. Ramsay first and said hey, we want to do it over here and we're looking for

1                        ROGER MARSHALL

2        you, is that fair?

3   A.   I can't answer that because I wasn't in on the initial

4        meeting, who called who first.

5                   MR. BOORMAN:  Cale, can I interrupt just

6        and I'm not trying to throw a wrench in this.

7                   MR. CONLEY:  Sure.

8                   MR. BOORMAN:  But I think something was

9        misstated a second ago.  I think it was suggested that

10       GMAX was selling helmets in the U.S.

11                  THE WITNESS:  Before contacting An Yng, is

12       that -- did I say that?

13                  MR. BOORMAN:  Did GMAX ever sell helmets?

14                  THE WITNESS:  No.

15                  MR. BOORMAN:  And I didn't want you to be

16       under the impression that GMAX was selling helmets

17       because that would take us off, that misconception

18       could grow; so if you want to clear that up, otherwise

19       I'll clear it up, but I just didn't want that to keep

20       going.

21                  MR. CONLEY:  Okay.  Well, and let's clear

22       that up.

23  BY MR. CONLEY:

24  Q.   Is it your testimony that Marshall Distributing sells

25       GMAX helmets?

ROGER MARSHALL

1

2   A.   Yes.  Or did.

3   Q.   Or did.  Up until what I'll call the relevant time

4        period, April 2013 or thereabouts?

5   A.   Yes.

6   Q.   For purposes of these questions.

7                 Marshall Distributing was the actual entity

8        selling the helmets that were branded with GMAX and

9        made at An Yng in Taiwan?

10  A.   Yes.

11  Q.   At its inception or any point up through 2013, did

12       GMAX have a relationship with any other manufacturing

13       facility other than An Yng for GMAX-branded helmets?

14  A.   No.

15                MR. CONLEY:  That clear it up?

16                MR. BOORMAN:  Yes.  Thank you.

17  BY MR. CONLEY:

18  Q.   If I slip again and say about sales, we understand

19       that's your testimony.  I got that, and if I slip up

20       it will be inadvertent.  It's okay.  And let me just

21       leap back to clear up the one other thing is that your

22       understanding of it, and I understand you weren't on

23       every phone call or you weren't with Mr. Ramsay

24       necessarily when it started.

25                When Mr. Ramsay came to you, he said hey,

ROGER MARSHALL

2    I've already talked to this An Yng in Taiwan, they

3    have agreed to make the helmets and let's start a

4    business where we work with them to ultimately have

5    GMAX-branded helmets sold in the United States, is

6    that --

7  A.    That's how I understood it, yes.

8  Q.    Okay.  And is that how it played out?

9  A.    Yes.

10  Q.    Do you know who Mr. Mr. Ramsay's initial contact was

11        at An Yng?

12  A.    No.

13  Q.    Who was your first contact at An Yng?

14  A.    You know, I don't recall.

15  Q.    Okay.

16  A.    I would have to guess, so --

17  Q.    Okay.  Let's go back as far as we can in your memory

18        to, you know, I'll take the who did you first contact,

19        who were the first people you remember dealing with at

20        An Yng?

21  A.    An Yng is owned by Po-Chou Yang and his wife and

22        operated by family members.  At the time he had a

23        nephew named Arron Yang who was operating as North

24        American sales manager, and his two sons, Darren and

25        Howard, and a daughter.

1        ROGER MARSHALL

2              Mr. and Mrs. Yang, Po-Chou Yang and the

3        wife, neither speak English, so we always spoke

4        through Howard and Daren, the two sons, and Arron the

5        sales manager.  Arron is no longer with the company,

6        so now the operating manager of the company is Darren

7        Yang.

8   Q.   Couple follow-ups to that answer.  Thank you.

9   A.   Okay.

10  Q.   Do you know when Darren became, and I'm not looking

11       for a specific date, but roughly the year or so in

12       which Darren became the operating manager of An Yng?

13  A.   No.

14  Q.   And can you -- can you give me some approximation, for

15       example, I've seen what I think we're going to believe

16       to be Darren in some communications.  It's Darren --

17       I'll get his E-mail address in a minute, but he's on

18       E-mails back and forth or he's -- there's a Darren

19       identified in meeting notes, and do you -- do you

20       believe, they're in the 2008, 2007 time frame, do you

21       believe he was probably the operating manager then to

22       your and GMAX's knowledge?

23  A.   I don't know.  Father was still working then, so I

24       would say no, but he was the person we communicated

25       with because father couldn't speak.

1          ROGER MARSHALL

2               Mr. and Mrs. Yang, Po-Chou Yang and the

3      wife, neither speak English, so we always spoke

4      through Howard and Daren, the two sons, and Arron the

5      sales manager.  Arron is no longer with the company,

6      so now the operating manager of the company is Darren

7      Yang.

8   Q.  Couple follow-ups to that answer.  Thank you.

9   A.  Okay.

10  Q.  Do you know when Darren became, and I'm not looking

11      for a specific date, but roughly the year or so in

12      which Darren became the operating manager of An Yng?

13  A.  No.

14  Q.  And can you -- can you give me some approximation, for

15      example, I've seen what I think we're going to believe

16      to be Darren in some communications.  It's Darren --

17      I'll get his E-mail address in a minute, but he's on

18      E-mails back and forth or he's -- there's a Darren

19      identified in meeting notes, and do you -- do you

20      believe, they're in the 2008, 2007 time frame, do you

21      believe he was probably the operating manager then to

22      your and GMAX's knowledge?

23  A.  I don't know.  Father was still working then, so I

24      would say no, but he was the person we communicated

25      with because father couldn't speak.

1                       ROGER MARSHALL

2    Q.   Okay.

3    A.   So we have always communicated with Darren.

4    Q.   Okay.  And do you know when Arron Yang became no

5         longer with the company to use your words?

6    A.   I'm referring to the operating agreement.

7    Q.   Okay.

8    A.   Should have a date.  Actually Arron Yang Shang Hsuan,

9         but she'll never record that one.

10                  MR. CONLEY:  We'll help you, Madam Court

11        Reporter, with spellings at the break.

12   A.   Looks like January 1, 2010, is when Arron -- young

13        Arron transferred his stock over to his uncle Po-Chou.

14   BY MR. CONLEY:

15   Q.   And that was going to be my next question.  If we look

16        at the last page of Exhibit 3, GMAX 00024, this

17        Po-Chou Yang, who is identified as a member of GMAX,

18        LLC, as of January 1, 2010, is the owner of An Yng.

19   A.   Yes.

20   Q.   And do you recall what, from the GMAX perspective,

21        what Mr. Yang's ownership interest was when he became

22        a member in January of 2010?

23   A.   His ownership interest in GMAX?

24   Q.   Yes, correct.

25   A.   1/6.

ROGER MARSHALL

1

2      October 23/06, did I read that correctly?

3   A.  Yes.

4   Q.  You attended this and Rueben McMurter, the product

5      manager or similar title attended for GMAX?

6   A.  Yes.

7   Q.  Do you recall who else from GMAX attended this?

8   A.  All the partners.

9   Q.  And who would that have been to your knowledge and

10     recollection?

11  A.  Jack Ramsay, Craig Shoemaker, Roger Marshall, Po-Chou

12     Yang and Mike Shean.

13  Q.  Why have all partners there?

14  A.  I'm sorry?  Repeat.

15  Q.  Why have all partners present in Taiwan for the

16     meeting?

17  A.  It's a business meeting.

18  Q.  Have you reviewed these notes?

19  A.  Yes.

20  Q.  And do you have a recollection, not of every, I'm not

21     saying of everything in here, but does this track your

22     independent memory of that meeting?

23  A.  As much as it can from that many years ago, yes.

24  Q.  Sure.  And let me say this, when you reviewed these

25     notes again presumably in preparation for today, did

1                          ROGER MARSHALL

2        you see anything in there that you thought that looks

3        wrong or inaccurate or that ought to be changed or

4        anything like that?

5                    MR. BOORMAN:  Object to the form, complex

6        question.

7   A.   Answer is yes.

8   BY MR. CONLEY:

9   Q.   Okay.  What did you -- and again, these are -- these

10       are Mr. McMurter's notes.  Tell me, first of all, let

11       me, tell me what you think is wrong.

12  A.   Item 63 where it says back to North America for design

13       work.  We did no designing other than appearance, like

14       graphics, and we had some input in the cover that goes

15       on top of the vents for appearance, and we didn't like

16       their initial design of the graphics, we thought it

17       was too bulky or too ugly and told them they had to

18       work on it.

19  Q.   So did -- did they work on it after you told them to

20       work on it?

21  A.   Yes.

22  Q.   And did they eventually get that graphics design to

23       GMAX's liking?

24  A.   Yes.

25  Q.   After you asked them to get it to your liking, right?

1                          ROGER MARSHALL

2   A.    Yes.

3   Q.    Let me now ask, in this document there are, for lack

4         of a better description, there are terms, there are

5         entries with different fonts or some are in all caps,

6         some are not.  I want to ask you to your, to the level

7         of your and GMAX's understanding, what Mr. McMurter

8         wrote versus what may be reflecting what someone else

9         said.

10                    MR. BOORMAN:  Object to the form, calls for

11        speculation, but answer if you can.

12  BY MR. CONLEY:

13  Q.    Well yeah, I mean --

14  A.    It was in three color.

15  Q.    Okay.

16  A.    The original was in three color.

17  Q.    Okay.  And I can kind of tell that even though I have

18        a black and white copy.  If I might try to get us

19        through this, on my black and white copy under number

20        one on page one there's sort of a, there's an all caps

21        section that is sort of a narrower font and then

22        starting with the words "see new schedule" it's a sort

23        of a thicker all caps font, and would I be correct,

24        probably in the original of those, those are two

25        different colors?

ROGER MARSHALL

2   A.   I think.

3   Q.   Okay.  And then if you look down under number two, we

4        have the narrower all cap font, the thicker or bolder

5        all cap font and then it looks like a slightly lighter

6        colored lower case font, do you see that?

7   A.   Where it says chin strap?

8   Q.   Yes, sir.

9   A.   That would be -- that would have been red and that was

10       the response from Mr. Yang.

11  Q.   Okay.  And you're getting exactly where I wanted to go

12       to understand; and again, I'm trying to get a gather

13       of the communications that were going on, and from

14       some of the entries it appeared to me what you just

15       said, that the lower case lighter colored entries,

16       such as the one under number two, "Chin strap, QC

17       system is officially start on October 23rd," are

18       entries by either Darren or someone with An Yng, is

19       that correct?

20  A.   Yes.

21  Q.   To your knowledge and understanding who wrote the

22       words in the narrower all cap font, such as in number

23       two to stick with that one example, says quality

24       control issues reviewed?

25  A.   I would have to assume, but by reading it it appears

ROGER MARSHALL

1

2     that all the large caps are Mr. McMurter's.

3  Q.  And you can tell me if I'm wrong, but might it be that

4     the narrower all caps were sort of what he had typed

5     up as the agenda and then what was typed in in the all

6     caps was what actually kind of was discussed at the

7     meeting?

8  A.  That's a fair assumption.

9  Q.  Okay.  And certainly as you reviewing it as another

10    member of the company, when you looked at it you -- am

11    I correct that you thought, okay, that's probably what

12    was going to be talked about in the narrower all cap,

13    here's what Rueben typed up about what was discussed

14    or what happened, and then these other lower case ones

15    are what An Yng said, is that fair?

16 A.  Yes.

17 Q.  I can leave here with that being your understanding --

18 A.  Yes.

19 Q.  -- of the entries?

20          Who is Elaine as noticed in number three?

21 A.  That would be Darren's sister I believe.

22 Q.  Is she -- would she have been in Taiwan?

23 A.  Yeah, I don't recall.  Says here she is now back in

24    Taiwan.  I don't know if she was someplace else.  I

25    don't recall.

ROGER MARSHALL

somewhere in North America, there were apparently --
so those were in-person meetings and communications
face to face, correct?

A.   Yes.

Q.   I believe there's a reference in this document, or one
we'll see in a minute, about there were some phone
calls with Darren?

A.   And Mr. McMurter, yeah.

Q.   Okay.  There were some sort of I'm presuming E-mail
correspondence I think we have seen or will see them,
correct?

A.   Yes.

Q.   Are you aware of any just plain old school letters
being sent?

A.   No.

Q.   Now, I'm going to ask you now if you could look at in
front of you Plaintiff's Exhibit 8.  It is an E-mail.
Should be in front of you, sir.  I placed it there
during the break.

A.   Okay.

Q.   Do you recognize this document?

A.   Yes.

Q.   And is it one of the documents pulled from the
business files of GMAX as kept in the ordinary course

ROGER MARSHALL

1

2      of business of GMAX for production to us?

3  A.   Yes, from my E-mail account.

4  Q.   And am I correct, this is an E-mail exchange between

5      you and Darren Yang in Taiwan?

6  A.   Yes.

7  Q.   The subject of line -- the bottom E-mail is

8      "earthquake survival," but the subject line of the top

9      part of the chain is all capital "exclusive

10     agreement," is that correct?

11 A.   Yes.

12 Q.   And I want to start at the bottom in what appears to

13     be the E-mail from you to Darren on Friday March 12th,

14     2010.  Do you see that?

15 A.   Yes.

16 Q.   And you wrote Darren, and this again is Darren Yang,

17     not the Darren from GMAX, right?

18 A.   Yes.

19 Q.   "We have no problem with South America since that was

20     not part of our original agreement."

21          Did I read that correctly?

22 A.   Yes.

23 Q.   Couple questions.  Number one is, I got to have the

24     feeling that I picked this up in the middle of a

25     conversation, that there was something before this, do

1                              ROGER MARSHALL

2          you have any prior parts of this chain?

3     A.   No, preceding it was probably verbal.

4     Q.   Okay.  Because it's just, and bear with me, it's the

5          E-mail with the topic re earthquake survival, which is

6          about this agreement.

7     A.   Well, we'd been in Taiwan and we had an earthquake

8          while we're sitting in our meeting, 5.7.

9     Q.   Oh wow, okay.

10    A.   Which none of us had ever experienced before.  Kind of

11         interesting when the chairs are rolling around the

12         room.

13                   MR. BOORMAN:  And Cale, I see what you're

14         saying.  We can go back and look for that to see if

15         there's something prior because I do see what you're

16         saying.

17    BY MR. CONLEY:

18    Q.   And I'm not suggesting anything nefarious.  You send

19         and receive enough E-mails and review enough of them

20         in your life, I think there may be more to it and if

21         you would look we would appreciate that.

22    A.   I've looked and I don't -- didn't find anything

23         previous but I can always look again.

24    Q.   That's fine, and thank you for doing that, sir.

25                   Now I want to ask about, we can deal with

ROGER MARSHALL

1

2      that later.  In the E-mail you refer to "our" original

3      agreement, and my question is, what was the original

4      agreement?

5   A.  The original agreement when we first started doing

6      business with them was verbally that we will buy, you

7      will be our only source for, excuse my voice, An Yng

8      will be our only source for helmet production and we

9      will be your only distribution network in North

10     America.

11              MR. BOORMAN:  And by we --

12              THE WITNESS:  GMAX.

13              MR. BOORMAN:  Will be the distribution

14     network or the partners?

15              THE WITNESS:  Well, we and the partners.

16  BY MR. CONLEY:

17  Q.  Okay.  And is that when -- when the subject line

18     exclusive agreement gets introduced, is that how you

19     would describe that or y'all described it between

20     yourselves?

21  A.  Yes.

22  Q.  That An Yng would be the only source for helmets that

23     GMAX or its members claimed or sold and that GMAX and

24     its distributors would only be involved with or sell

25     helmets made at the An Yng facility.

ROGER MARSHALL

1

2   A.   Yes.

3   Q.   And is this really the closest we have to any written

4       document confirming those terms --

5   A.   Yes.

6   Q.   -- that you've been able to locate?  All right.

7   A.   Should I explain further?

8   Q.   Would you like to explain your prior answer further?

9   A.   Well, I had asked Mr. Yang to have his father sign, or

10       he sign an exclusive agreement, and it comes down to a

11       personal relationship in that dad said you are our

12       only customers in North America, and it comes -- I

13       think it came down to an affront to his honesty to

14       request it in writing, so that's as best as I can do

15       was to have him respond to an E-mail.

16   Q.   Okay.  Fair enough.

17   A.   And so far they've honored it and so have we.

18   Q.   And I was going to say, the -- he makes a reference,

19       Darren does, in the part at the top about, you know,

20       we don't want to break the promise and the friendship,

21       you're working with us more than ten years, you

22       understand what kind of person my dad is, please don't

23       worry about everything, and did I read that correctly?

24   A.   Um-hum.

25   Q.   And that that would seem to further support what

ROGER MARSHALL

1

2  Q.   Okay.  What part of that -- I'm going to have to

3       follow up.

4  A.   There's a lot of debate about the Snell Foundation and

5       the Snell helmet, a lot of debate about whether or not

6       with the days, DOT standards, if it isn't an

7       antiquated standard.

8  Q.   If the DOT standard is antiquated, correct?

9  A.   No, the Snell is antiquated.

10 Q.   Snell is antiquated.  Do you know which is older,

11      Snell or DOT?

12 A.   I do not know.

13 Q.   All right.  Let me take a step back and try to get a

14      better understanding.  It's one of the main reasons

15      I'm here today is to get a better understanding of

16      these interactions, and from looking at Exhibit 5 and

17      a couple other ones that I'm going to, we're going to

18      talk about in a minute, it looks like when y'all get

19      together it's a business but a friendly meeting.

20 A.   Yes.

21 Q.   And that there's, based on these minutes, looks like

22      there's give and take and discussion of various issues

23      by the members of GMAX and its distributors and the

24      representatives of An Yng, is that a fair conclusion

25      to draw?

1                              ROGER MARSHALL

2    A.    Yes.

3    Q.    And where there's, you know, both sides are giving

4          input to the discussion.

5    A.    Yes.

6    Q.    GMAX is giving input on different issues that are

7          brought up and An Yng is giving input, correct?

8    A.    Yes.

9    Q.    And would it be fair to say that both sides are

10         actively involved in trying to get a good product?

11   A.    Yes.

12   Q.    That ultimately gets sold by the distributors to

13         consumers.

14   A.    Yes.

15   Q.    I want to leap back to one other question now that

16         I've got a better understanding is, and I asked a

17         variation of it before, is -- asked why have two

18         companies and I want to ask it again a little bit more

19         refined.

20                    Why not just have GMAX do the, play the

21         role it played and being the distributor?

22   A.    They're not in the business of distributing.

23   Q.    They're in the business of being this communicator to

24         the factory between the distributor and the factory.

25   A.    Very much like a broker.  It's another way that I

ROGER MARSHALL

1

2      be fair for me to conclude that the 68S helmet was a

3      large topic of discussion at that meeting?

4   A.  Yes.

5   Q.  And was this meeting also attended by the, all the

6      members of GMAX, LLC?

7   A.  It would take an assumption.

8   Q.  You were there?

9   A.  Yes.

10  Q.  Rueben McMurter, the product manager or whatever his

11      title was, he was there.

12  A.  Yes.

13  Q.  Someone from Marshall Distributing there?

14  A.  Yes.

15  Q.  Western Power Sports?

16  A.  Yes.

17  Q.  Gamma?

18  A.  Yes.

19  Q.  And similar to my questions about the last meeting

20      that we talked about, the one in 2006 in Taiwan, at

21      this meeting in Ontario in May of 2007, was it a

22      collegial meeting in which representatives of An Yng

23      and representatives of GMAX and its distributors got

24      together to talk about, give input to these product

25      issues?

ROGER MARSHALL

2    a question I wanted to ask at some point that relates

3    to, I believe I marked it as Exhibit 4, it's an E-mail

4    chain.

5              I had originally asked you about, just

6    about the title of Mr. McGathy, but I wanted to follow

7    up since the topic of warranty came up, that Exhibit 4

8    is an E-mail chain that originated from a GMAX

9    consumer who had been in Iraq and had some nice things

10   to say about GMAX, and there's back and forth between

11   that customer and Mr. McGathy, do you remember that

12   document?

13   A.   Yes.  Yes.

14   Q.   And what I just want to confirm in this case with

15        Mister looks like Jason Hudson (sic) back in 2010,

16        when he raised this issue and sent you the helmet,

17        GMAX sent him a new one, correct?

18   A.   Yes.

19   Q.   And was that the common practice at GMAX during the,

20        I'll call the relevant time period, 2010 up through

21        2013, that if a customer cracked or broke a helmet or

22        sent it in that you would send them a new one, GMAX

23        would?

24   A.   Yes.

25   Q.   Okay.  Did An Yng send them a new one?

1                    ROGER MARSHALL

2        testimony which was recommendations and requests.

3                 MR. CONLEY:  I'll rephrase it.

4    BY MR. CONLEY:

5    Q.   To your knowledge did An Yng implement all of the

6         recommendations of the group made by GMAX and its

7         distributors?

8    A.   I don't recall.

9    Q.   Okay.  You don't recall them not implementing them.

10   A.   Well, they weren't all recommendations as a broad

11        blanket.  I don't recall.

12   Q.   Fair enough.  Sitting here today, you can't say yeah,

13        I remember one time we recommended so and so and they

14        told us the heck with it, you don't remember such an

15        event occurring?

16   A.   No.

17   Q.   Is that fair?

18   A.   Yes.

19   Q.   Last one on Exhibit 6 and we'll move on.

20                 Number 18, there's another discussion about

21        Snell, do you see that?

22   A.   Yes.

23   Q.   And again, just to be clear, because I've got to make

24        a record, that the first part in the bold all caps

25        would have been what Rueben McMurter as the GMAX --

ROGER MARSHALL

1

2    A.   Starting at the factory.

3    Q.   Yes, sir.

4    A.   Factory ships to one of the three distributors.  The

5         distributors then sell it to the retail stores and of

6         course the retail store sells to the consumer.

7    Q.   So GMAX never gets them at all.

8    A.   Physically they do not get a helmet, no.

9    Q.   The role of GMAX is limited to what we've already

10        discussed here today in terms of the interactions and

11        meetings and that sort of thing that they have with An

12        Yng.

13   A.   Yes.

14   Q.   I'll ask you a few more questions when we do the next

15        depo.  It's going to be short.

16             Number 11, when and where and by whom and

17        by what method did GMAX brand logos, stickers or

18        labels are attached to GMAX-branded helmets, I believe

19        you've already told me that the -- that the exterior

20        aesthetic designs, the colors, the drawings, where it

21        says GMAX, that's all put on the helmet in -- at the

22        factory.

23   A.   Right.

24   Q.   And then but as you also described there have been

25        issues over the course of time where paint got messed